Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

Docket No.:_____ (      )

Plaintiffs,

-against-

**Plaintiff Demands a
Trial by Jury**

RIAZ AHMAD, M.D., COMMUNITY MEDICAL
CARE OF N.Y., P.C., COMFORT CARE MEDICAL
PLLC, DLC COMPREHENSIVE MEDICAL PLLC,
AHMAD RIAZ M.D. (AS A SOLE PROPRIETORSHIP),
RIAZ AHMAD M.D. (AS A SOLE PROPRIETORSHIP)
and JOHN DOE DEFENDANTS "1" THROUGH "10,"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Riaz Ahmad, M.D., Community Medical

Care of N.Y., P.C., Comfort Care Medical PLLC, DLC Comprehensive Medical PLLC, Ahmad Riaz

M.D. (as a Sole Proprietorship), Riaz Ahmad, M.D. (as a Sole Proprietorship) and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,300,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-Fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported extracorporeal shockwave therapy ("ESWT"), functional capacity evaluation ("FCE") tests, transcranial doppler testing ("TDT"), vestibular function testing ("VFT"), spinal ultrasound testing ("SUT"), patient consultations, nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies, (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds").

2.      Defendant Riaz Ahmad, M.D. ("Dr. Ahmad") is a physician licensed to practice in New York who purports to own: (i) a series of medical professional corporations and medical professional limited liability companies including Defendants Community Medical Care of N.Y., P.C. ("Community Medical"), Comfort Care Medical PLLC ("Comfort Care"), and DLC Comprehensive Medical PLLC ("DLC Comprehensive"); and (ii) two unincorporated sole proprietorships using the name Ahmad Riaz, M.D. (the "Ahmad Riaz Practice") and Riaz Ahmad, M.D. (the "Riaz Ahmad Practice"), each having a unique tax identification number.  Dr. Ahmad, conspiring with John Doe Defendants "1" through "10," intentionally used the different names and entities – i.e., Community Medical, Comfort Care, DLC Comprehensive, Ahmad Riaz Practice, and Riaz Ahmad Practice (collectively, the "Provider Defendants") – in order to quickly submit large volumes of fraudulent and inflated billing to GEICO and other New York automobile insurers for

the excessive, illusory, and medically useless Fraudulent Services, as part of a scheme to exploit New York's No-fault insurance system.

3.      The Provider Defendants purport to be legitimate professional practices, but they operated on a transient basis, did not maintain any standalone practices, did not have any patients of their own, and did not provide any legitimate or medically necessary healthcare services.  Dr. Ahmad, through his association with John Doe Defendants "1"-"10," perpetrated the fraudulent scheme by establishing illegal referral and kickback arrangements with the owners and/or managers of a large number of multidisciplinary medical "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with No-fault insurance (the "No-Fault Clinics"). The Defendants' illegal referral and kickback arrangements, which were facilitated through, among other things, check cashing at a facility in New Jersey by an individual who was previously indicted for recruiting individuals to act as phony patients, allowed the Provider Defendants to access a steady stream of automobile accident victims at the Clinics to whom they could provide, or purport to provide, the Fraudulent Services.

4.      By this action, GEICO seeks to recover more than $2,300,000.00 stolen from it by Defendants through their fraudulent scheme and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $3,200,000.00 in pending fraudulent No-Fault insurance claims for the Fraudulent Services that have been submitted by or on behalf of the Provider Defendants because:

  (i)      the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

  (ii)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback and referral arrangements; and

(iv)    in many cases, the Fraudulent Services were provided – to the extent provided at all – by independent contractors rather than by employees of the Provider Defendants, and therefore were not reimbursable.

5.    The Defendants fall into the following categories:

(i)    Defendant Riaz Ahmad, M.D. ("Dr. Ahmad") is a physician licensed to practice medicine in the State of New York, who purports to own the Provider Defendants, and who purported to perform some of the Fraudulent Services;

(ii)    The Provider Defendants are: (i) New York professional entities Community Medical Care of N.Y., P.C. ("Community Medical"), Comfort Care Medical PLLC ("Comfort Care"), DLC Comprehensive Medical PLLC ("DLC Comprehensive"); and (ii) unincorporated sole proprietorships Riaz Ahmad, M.D. (the "Ahmad Riaz Practice") and Ahmad Riaz, M.D. (the "Riaz Ahmad Practice") through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO; and

(iii)    John Doe Defendants "1" through "10" are individuals who are not licensed healthcare professionals but participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.    As discussed in detail herein, the Defendants at all relevant times have known that:

(i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges

4

submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services were provided – to the extent provided at all – by independent contractors, rather than by employees of the Provider Defendants.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO through the Provider Defendants.

8.      The charts annexed hereto as Exhibits "1" through "5" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO under the names of the Provider Defendants.

9.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,300,000.00.

## THE PARTIES

**I.      Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

**II.     Defendants**

11.     Defendant Dr. Ahmad resides in and is a citizen of New York. Dr. Ahmad was licensed to practice medicine in New York on June 21, 1994, serves as the nominal owner of the Provider Defendants, and purports to perform some of the Fraudulent Services.

12.     Defendant Community Medical is a New York professional corporation incorporated on or about May 21, 2007, with its principal place of business in New York. Community Medical purports to be owned and controlled by Dr. Ahmad.  Since 2021, Community Medical has been used by Dr. Ahmad and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

13.     Defendant Comfort Care is a New York professional limited liability company organized on or about August 28, 2017, with its principal place of business in New York. Comfort Care purports to be owned and controlled by Dr. Ahmad.  Since 2020, Comfort Care has been used by Dr. Ahmad and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

14.     Defendant DLC Comprehensive is a New York professional limited liability company organized on or about March 7, 2002, with its principal place of business in New York. DLC Comprehensive purports to be owned and controlled by Dr. Ahmad. Since 2021, DLC Comprehensive has been used by Dr. Ahmad and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

15.     Defendant Ahmad Riaz Practice is an unincorporated sole proprietorship using a tax identification number corresponding to Dr. Ahmad's name and license, with its principal place of business in New York. The Ahmad Riaz Practice purports to be owned and controlled by Dr. Ahmad.  Since 2021, the Ahmad Riaz Practice has been used by Dr. Ahmad and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

16.     Defendant Riaz Ahmad Practice is an unincorporated sole proprietorship using a tax identification number corresponding to Dr. Ahmad's name and license, with its principal place of business in New York.  The Riaz Ahmad Practice purports to be owned and controlled by Dr.

Ahmad.  Since 2021, the Riaz Ahmad Practice has been used by Dr. Ahmad and John Doe Defendants "1"-"10"  to submit fraudulent billing to GEICO and other insurers.

17.     Upon information and belief, John Doe Defendants "1" through "10" reside in and are citizens of New York. John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

22.     For example, most of the billing and associated documentation submitted through the Provider Defendants to GEICO was mailed from Brooklyn, New York and Queens, New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Laws Governing No-Fault Reimbursement

24.     New York's No-Fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

26.     An Insured can assign his/her right to No-Fault Benefits to healthcare goods and services providers in exchange for those services.

27.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as an "HCFA-1500" form).

28.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

30.     In New York, only a licensed physician may: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

31.     Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

32.     New York law prohibits licensed healthcare providers from paying or accepting payments (i.e., kickbacks) in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

33.     Pursuant to Education Law § 6512, § 6530(11), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

34.     Pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

35.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate its treatments, or if it engages in unlawful fee splitting with unlicensed individuals.

36.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits; and (ii) insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and/or local laws.

37.     In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

38.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits

<u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law ….

39.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

40.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

41.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

42.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

11

## II.     **The Defendants' Fraudulent Scheme**

### A.     **Overview of the Defendants' Fraudulent Scheme**

43.     Beginning in 2020 and continuing through the present day, Dr. Ahmad and John Doe Defendants "1"-"10" masterminded and implemented a complex fraudulent scheme in which they used the Provider Defendants to exploit Insureds for financial gain by billing GEICO and other New York automobile insurers millions of dollars in fraudulent billing for medically unnecessary, illusory, and otherwise non-reimbursable healthcare services (i.e., the Fraudulent Services) resulting in the payment of No-Fault Benefits to the Defendants that they were never entitled to receive.

44.     Defendants' fraudulent scheme to exploit the New York No-fault insurance system began on the heels of material changes adopted by the New York Department of Financial Services ("DFS") regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to No-fault reimbursement in New York.

45.     Those DFS changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, making many services that historically had been abused either ineligible for reimbursement or subject to reduced reimbursement, establishing daily reimbursement limits for related disciplines, and limiting payment for redundant and unwarranted treatment.

46.     While these DFS changes in the application of the Fee Schedule prevented Defendants from engaging in the same kinds of No-Fault insurance fraud schemes used in the past, Defendants seized on these changes in the Fee Schedule (or lack thereof) and concocted a fraudulent

treatment and billing scheme using a series of professional corporation names and unincorporated sole proprietorships (i.e, the Provider Defendants) to bill for the Fraudulent Services.

47.     The Fraudulent Services billed under the names of the Provider Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

48.     Dr. Ahmad did not operate the Provider Defendants at any single, fixed office location, did not market the existence of the Provider Defendants to the general public, did not advertise for patients, and never sought to build name recognition, or make any legitimate efforts of his own to attract patients on behalf of the Provider Defendants.

49.     Dr. Ahmad did not have his own patients and did nothing to create a patient base for the Provider Defendants. Indeed, Dr. Ahmad did virtually nothing that would be expected of the owner of legitimate medical professional entities and legitimate unincorporated practices to develop their reputations and attract patients.

50.     The Provider Defendants had no fixed treatment locations of any kind, did not maintain stand-alone practices, were not owners or leaseholders in any of the real property from which they purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise or market their services to the general public.

51.     Instead, Dr. Ahmad, colluding with John Doe Defendants "1" through "10," operated the Provider Defendants on an itinerant basis from various No-Fault Clinics, primarily located in Brooklyn, Queens, and Bronx, where the Defendants received steady volumes of

patients through no efforts of their own, but rather through illegal referral and kickback relationships.

52.     The Defendants operated the Provider Defendants on an overlapping basis, with multiple providers operating simultaneously, and providing, or purporting to provide, the same or similar services from various No-Fault Clinics without any legitimate business reason for doing so. For example, all five of the Provider Defendants purported to provide ESWT to Insureds, one of the Fraudulent Services billed to GEICO.

53.     The Defendants also often operated the Provider Defendants from many of the same No-Fault Clinics on different days and/or times.  For example, Community Medical, Comfort Care, and the Riaz Ahmad Practice, each separately billed GEICO for Fraudulent Services purportedly rendered at three of the same No-Fault Clinics.

54.     Dr. Ahmad and the Defendants operated the Provider Defendants on an overlapping basis and from many of the same No-Fault Clinics on different days and/or times in order to both submit huge volumes of billing for the Fraudulent Services as quickly as possible and to try to minimize the large volume of billing from any one tax identification number in an attempt to conceal the scheme from GEICO and other New York automobile insurers.

55.     The Defendants' scheme to submit huge volumes of billing for the Fraudulent Services as quickly as possible required obtaining access to the No-Fault Clinics' patient bases (i.e., the Insureds), which Defendants did by entering into illegal financial and kickback arrangements with unlicensed individuals associated with the No-Fault Clinics who provided the Defendants access to the patients who were treated, or who purported to be treated, at the No-Fault Clinics.

56.     The Defendants thereafter subjected Insureds at the No-Fault Clinics to various medically unnecessary and illusory healthcare services (i.e., the Fraudulent Services), all solely to maximize profits without regard to genuine patient care.

57.     The No-Fault Clinics where the Provider Defendants operated included the following clinic locations, many of which were used by multiple Provider Defendants:

     (i)   <u>Community Medical</u>

- 102-28 Jamaica Avenue, Jamaica
- 1100 Pelham Parkway, Bronx
- 1122 Coney Island Avenue, Brooklyn
- 1314 Coney Island Avenue, Brooklyn
- 146 Empire Boulevard, Brooklyn
- 152-80 Rockaway Boulevard, Jamaica
- 1568 Ralph Avenue, Brooklyn
- 160-59 Rockaway Boulevard, Jamaica
- 1650 Eastern Parkway, Brooklyn
- 1735 Pitkin Avenue, Brooklyn
- 1975 Linden Boulevard, Elmont
- 2184 Flatbush Avenue, Brooklyn
- 222-01 Hempstead Avenue, Queens Village
- 225-21 Linden Boulevard, Cambria Heights
- 2386 Jerome Avenue, Bronx
- 245 Rockaway Avenue, Valley Stream
- 2488 Grand Concourse, Suite 206, Bronx
- 3041 Avenue U, Brooklyn
- 3250 Westchester Avenue, Bronx
- 3432 East Tremont Avenue, Bronx
- 3626 Bailey Avenue, Bronx
- 37 Smith Street, Freeport
- 3910 Church Avenue, Brooklyn
- 430 West Merrick Road, Valley Stream
- 60 Belmont Avenue, Brooklyn
- 625 East Fordham Road, Bronx
- 632 Utica Avenue, Brooklyn
- 647 Bryant Avenue, Bronx
- 6937 Myrtle Avenue, Glendale
- 8217 Woodhaven Boulevard, Glendale
- 8925 130th Street, Jamaica
- 9016 Sutphin Boulevard, Jamaica

- 92-08 Jamaica Avenue, Woodhaven
- 9701 101st Avenue, Brooklyn

(ii)    Comfort Care

- 146 Empire Boulevard, Brooklyn
- 152-80 Rockaway Boulevard, Jamaica
- 560 Prospect Avenue, Bronx
- 60 Belmont Avenue, Brooklyn
- 647 Bryant Avenue, Bronx
- 8217 Woodhaven Boulevard, Glendale
- 1100 Pelham Parkway, Bronx

(iii)   DLC Comprehensive

- 1120 Morris Park Avenue, Bronx
- 1655 Richmond Avenue, Staten Island
- 1894 Eastchester Road, Bronx
- 3626 Bailey Avenue, Bronx
- 3626 East Tremont Avenue, Bronx
- 3910 Church Avenue, Brooklyn
- 5127 Queens Boulevard, Woodside
- 665 Pelham Parkway North, Bronx
- 8715 115th Street, Richmond Hill
- 92-07 Roosevelt Avenue, Jackson Heights
- 951 Brook Avenue, Bronx

(iv)    Ahmad Riaz Practice

- 102-34 Atlantic Avenue, Ozone Park
- 108 Kenilworth Place, Brooklyn
- 14 Bruckner Boulevard, Bronx
- 176 Wilson Avenue, Brooklyn
- 180-09 Jamaica Avenue, Queens
- 1819 Merrick Avenue, Merrick
- 222-01 Hempstead Avenue, Queens Village
- 30 South Central Avenue, Valley Stream
- 3407 White Plains Road, Bronx
- 55 East 115th Street, New York
- 550 Remsen Avenue, Brooklyn
- 632 Utica Avenue, Brooklyn
- 71 South Central Avenue, Valley Stream
- 8925 130th Street, Jamaica
- 9801 Foster Avenue, Brooklyn

    (v)    <u>Riaz Ahmad Practice</u>

- 1100 Pelham Parkway, Bronx
- 146 Empire Boulevard, Brooklyn
- 160-59 Rockaway Boulevard, Jamaica
- 1650 Eastern Parkway, Brooklyn
- 170-04 Henley Road, Jamaica
- 1975 Linden Boulevard, Elmont
- 3432 East Tremont Avenue, Bronx
- 3626 Bailey Avenue, Bronx
- 560 Prospect Avenue, Bronx
- 60 Belmont Avenue, Brooklyn
- 6937 Myrtle Avenue, Glendale
- 8217 Woodhaven Boulevard, Glendale

**B.     The Defendants' Illegal Kickback and Referral Relationships**

58.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics provided facilities for the Provider Defendants, as well as a "revolving door" of other medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, in order to exploit New York's No-Fault insurance system.

59.     Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, created and controlled the patient base at the No-Fault Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

60.     Dr. Ahmad did not have his own patients at the Clinics and did nothing to create a patient base.

61.     Dr. Ahmad did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the Provider Defendants at the No-Fault Clinics.

62.     Dr. Ahmad did virtually nothing that would be expected of the owner of legitimate medical professional entities to develop their reputation and attract patients to the No-Fault Clinics, instead focusing on operating the Provider Defendants as part of the fraudulent scheme to exploit New York's No-fault insurance system.

63.     As Dr. Ahmad did not have any patients of his own at the No-Fault Clinics, the healthcare services that he could provide to the patients at the No-Fault Clinics was limited and controlled by the owners of the No-Fault Clinics, who were interested only in maximizing profits without regard to genuine patient care.

64.     The Clinics provided facilities for the Provider Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

65.     In fact, GEICO has received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

66.     For example,

    i.    GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 15280 Rockaway Boulevard, Jamaica, from a "revolving door" of more than 85 purportedly different healthcare providers.

    ii.   GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 9016 Sutphin Boulevard, Jamaica, from a "revolving door" of more than 80 purportedly different healthcare providers

     iii.    GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 647 Bryant Avenue, Bronx, from a "revolving door" of more than 100 purportedly different healthcare providers.

     iv.    GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 3041 Avenue U, Brooklyn, from a "revolving door" of more than 75 purportedly different healthcare providers.

     v.    GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 22201 Hempstead Avenue, Queens Village, from a "revolving door" of more than 50 purportedly different healthcare providers.

67. Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, create and control the patient bases at the clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.

68. In keeping with the fact that unlicensed laypersons controlled many of the No-Fault Clinics and that the Defendants paid illegal kickbacks in exchange for patient referrals, several of the No-Fault Clinics from which the Provider Defendants purported to operate are identified in an ongoing criminal proceeding, United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose") and noted as being controlled by laypersons and as receiving patients as a result of illegal kickback and referral arrangements.  The Government affidavits unsealed in USA v. Rose include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to the following layperson-controlled No-Fault Clinics: (i) 8715 115th Street, Richmond Hill, and (ii) 69-37 Myrtle Avenue, Glendale, both locations where the Provider Defendants purported to provide services to Insureds.

69. In further keeping with the fact that unlicensed laypersons controlled many of the No-Fault Clinics and that the Defendants paid illegal kickbacks in exchange for patient referrals, a chiropractor who performed healthcare services at the No-Fault Clinic located at 625 East Fordham Road, Bronx (the "Fordham Road Clinic") – a clinic from where certain of the Provider Defendants

also purportedly performed some of the Fraudulent Services – stated under oath, among other things, that the Fordham Road Clinic was owned by three unlicensed laypersons and that he discovered that the clinic had used prescriptions containing his name and purported signature despite not actually being signed, reviewed, or authorized by him.

70.     Similarly, a physician who worked at the 3910 Church Avenue No-Fault Clinic – where some of the Provider Defendants also operated – stated under oath that he ended his involvement with this Clinic because of, among other things, (i) his concern about the manner in which patients were brought to the clinic; (ii) the manner in which the clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

71.     Dr. Ahmad, in order to obtain access to the No-Fault Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, including John Doe Defendants "1"-"10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

72.     The financial arrangements that the Defendants entered into with the No-Fault Clinics included the payment of fees ostensibly to "rent" space or personnel from the Clinics or, upon information and belief, fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, or collection services. However, these were actually disguised kickback payments in exchange for patient referrals to the Provider Defendants for the medically unnecessary Fraudulent Services.

73.     In keeping with the fact that the ostensibly legitimate "rent" payments by Dr. Ahmad and the Provider Defendants were actually disguised kickbacks in exchange for patient referrals, the

amounts of the "rental" payments were far in excess of the legitimate fair market value of the putative non-exclusive use of the clinic locations.

74.     In further keeping with the fact that the Defendants made payments pursuant to illegal kickback and referral arrangements, multiple checks issued to DLC Comprehensive were illegally exchanged for cash at a check cashing facility in New Jersey called Cambridge Clarendon Financial Service, LLC d/b/a United Check Cashing ("Cambridge Clarendon").  Virtually all of these checks were exchanged for cash by an individual named Alla Kuratova, who was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.

75.     Dr. Ahmad and the Provider Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the Provider Defendants for the medically unnecessary Fraudulent Services at the No-Fault Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

76.     The amount of kickbacks paid by Dr. Ahmad and the Provider Defendants generally was based on the volume of Insureds that were steered to the Provider Defendants for the purported medically unnecessary services.

77.     Dr. Ahmad had no genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics, as the patients had no scheduled appointments specifically with the Provider Defendants.

78.     Instead, the Insureds were simply directed by the unlicensed persons associated with the No-Fault Clinics, to subject themselves to treatment by whatever healthcare provider was working for the Provider Defendants that day, because of the kickbacks paid by the Defendants.

79.     The unlawful kickback and referral arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocols and defraud GEICO and other insurers for huge sums for the Fraudulent Services.

80.     Dr. Ahmad at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent scheme.

81.     In fact, Dr. Ahmad split the billing for the Fraudulent Services across multiple professional entities in order to limit the amount of billing and type of services being submitted by each Provider Defendant.

82.     Dr. Ahmad and the Defendants conducted their scheme through multiple medical professional entities using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

**C.      The Defendants' Predetermined Fraudulent Treatment and Billing Protocol**

83.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to the Fraudulent Services as part of a predetermined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

84.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

85.     Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

86.     Each step in the predetermined fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Provider Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

> **1.     The Defendants' Fraudulent Charges for Extracorporeal Shockwave Therapy ("ESWT")**

87.     As part of the predetermined fraudulent treatment protocol, the Defendants purported to subject many Insureds to medically unnecessary and experimental extracorporeal shockwave therapy ("ESWT") through each of the Provider Defendants.

88.     The charges for the ESWT were fraudulent in that the treatments were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements.

89.     The Defendants billed GEICO for ESWT through the Provider Defendants under CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.

90.     The Defendants' billing for ESWT through each of the Provider Defendants under CPT code 0101T typically resulted in multiple charges of at least $700.00 per each ESWT treatment purportedly provided.

91.     Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy."

92. ESWT is a nonsurgical treatment that involves the delivery of shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

93. During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area. As the applicator is moved over the treatment area, high energy shock waves that allegedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

94. Typically, the Defendants purported to perform ESWT treatments on Insureds purportedly experiencing musculoskeletal pain, including back, shoulder, knee, and/or neck pain.

95. In a legitimate clinical setting, treatment for neck, back, knee, or shoulder pain begins with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

96. By contrast, the use of ESWT for the treatment of back, neck, knee, and shoulder pain is experimental and investigational.

97. In keeping with the fact that ESWT for the treatment of back, neck, knee, and shoulder pain is not a legitimate treatment option, ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, knee, or shoulder pain.

98. What is more, there are no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, knee, or shoulder pain.

99. Furthermore, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions, that there is uncertainty associated

with this intervention, and it is not reasonable and necessary for the treatment of musculoskeletal conditions and therefore is not covered.

100.    As with the other Fraudulent Services, the billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol and was designed solely to financially enrich the Defendants rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

101.    The charges for the medically unnecessary ESWT also were fraudulent in that the Defendants did not even actually provide ESWT that satisfied the requirements of CPT code 0101T.

102.    Instead, the Defendants actually provided Radial Pressure Wave Therapy.

103.    Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

104.    Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

105.    Even if the Defendants had provided treatment that was reimbursable under CPT code 0101T, such treatment would have been medically unnecessary and was performed – to the extent that it was performed at all – pursuant to the Defendants' fraudulent treatment and billing protocols.

106.    In keeping with the fact that the purported ESWT was provided pursuant to the Defendants' fraudulent treatment and billing protocols without regard to the genuine needs of the patient, the Defendants, in certain cases involving bills submitted through Community Medical, falsely represented that the Insureds had received "diagnostic MRI imaging" prior to receiving the purported ESWT.

107.    However, in many cases, the Insureds had not actually received an MRI prior to the

purported ESWT.

108.    For example:

(i)     On May 27, 2021, an Insured named AF was purportedly involved in an automobile accident.  The Defendants subsequently purported to provide ESWT of the cervical and thoracic areas through Community Medical to AF on June 10, 2021. The Defendants' June 10, 2021 treatment report represents that AF had received "diagnostic MRI imaging" prior to the ESWT and that the "diagnostic MRI imaging" aided the Defendants in administering the ESWT. However, AF did not receive an MRI prior to purportedly receiving the June 10, 2021 ESWT.

(ii)    On April 22, 2021, an Insured named TB was purportedly involved in an automobile accident.  The Defendants subsequently purported to provide ESWT of the cervical and left shoulder areas through Community Medical to TB on April 30, 2021. The Defendants' April 30, 2021 treatment report represents that TB had received "diagnostic MRI imaging" prior to the ESWT and that the "diagnostic MRI imaging" aided the Defendants in administering the ESWT.  However, TB did not receive an MRI prior to purportedly receiving the April 30, 2021 ESWT.

(iii)   On May 27, 2021, an Insured named ME was purportedly involved in an automobile accident.  The Defendants purported to provide ESWT of the cervical and lumbar areas through Community Medical to ME on June 10, 2021. The Defendants' June 10, 2021 treatment report represents that ME had received "diagnostic MRI imaging" prior to the ESWT and that the "diagnostic MRI imaging" aided the Defendants in administering the ESWT. However, ME did not receive an MRI prior to purportedly receiving the June 10, 2021 ESWT.

(iv)    On May 3, 2021, an Insured named JY was purportedly involved in an automobile accident.  The Defendants subsequently purported to provide ESWT of the cervical and lumbar areas through Community Medical to JY on May 11, 2021. The Defendants' May 11, 2021 treatment report represents that JY had received "diagnostic MRI imaging" prior to the ESWT and that the "diagnostic MRI imaging" aided the Defendants in administering the ESWT. However, JY did not receive an MRI prior to purportedly receiving the May 11, 2021 ESWT.

(v)     On May 4, 2021, an Insured named DR was purportedly involved in an automobile accident.  The Defendants subsequently purported to provide ESWT of the right shoulder and lumbar area through Community Medical to an Insured named DR on May 19, 2021. The Defendants' May 19, 2021

treatment report represents that DR had received "diagnostic MRI imaging" prior to the ESWT and that the "diagnostic MRI imaging" aided the Defendants in administering the ESWT. However, DR did not receive an MRI prior to purportedly receiving the May 19, 2021 ESWT.

109.    These are only representative examples. In many of the claims identified in Exhibit "1," the Defendants falsely represented that the Insured had received "diagnostic MRI imaging" prior to receiving ESWT.

110.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT code 0101T only contemplates billing for the code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

111.    Notwithstanding the clear language of the code, Defendants fraudulently unbundled the service in the billing that was submitted by duplicating the code multiple times (and increasing the corresponding charges) and submitting multiple bills to GEICO for each area of the body where the ESWT was performed.

112.    For ESWT charges submitted through the Provider Defendants, the Defendants would submit a separate charge for each body part purportedly treated on a particular date of service.  Collectively, these charges often exceeded more than $1,400.00 per date of service.

113.    For example:

(i)    On November 15, 2021, the Defendants purportedly administered ESWT to an Insured named JM's cervical spine, thoracic spine, lumbar spine, right shoulder, right hip, left hip, right knee, and right foot.  The Defendants then submitted eight separate charges to GEICO under CPT code 0101T through the Ahmad Riaz Practice totaling more than $5,590.00.

(ii)   On October 27, 2021, the Defendants purportedly administered ESWT to an Insured named FC's cervical spine, lumbar spine, right shoulder, left shoulder, left elbow, left wrist, right hip, left hip, right knee, left knee, and

left ankle.  The Defendants then submitted eleven separate charges to GEICO under CPT code 0101T through the Ahmad Riaz Practice totaling more than $7,600.00.

(iii) On October 25, 2021, the Defendants purportedly administered ESWT to an Insured named SG's cervical spine, lumbar spine, left shoulder, right shoulder, left knee, and right knee.  The Defendants then submitted six separate charges to GEICO under CPT code 0101T through the Ahmad Riaz Practice totaling more than $4,100.00.

(iv) On September 28, 2021, the Defendants purportedly administered ESWT to an Insured named MP's thoracic spine and lumbar spine.  The Defendants then submitted two separate charges to GEICO under CPT code 0101T through Comfort Care totaling more than $1,400.00.

(v) On November 8, 2021, the Defendants purportedly administered ESWT to an Insured named FN's cervical spine, lumbar spine, and right shoulder.  The Defendants then submitted three separate charges to GEICO under CPT code 0101T through Comfort Care totaling more than $2,100.00.

(vi) On May 21, 2021, the Defendants purportedly administered ESWT to an Insured named LS' lumbar spine and left shoulder.  The Defendants then submitted two separate charges to GEICO under CPT code 0101T through Community Medical totaling more than $1,400.00.

(vii) On October 6, 2021, the Defendants purportedly administered ESWT to an Insured named DV's cervical spine and lumbar spine.  The Defendants then submitted two separate charges to GEICO under CPT code 0101T through DLC Comprehensive totaling more than $1,400.00.

(viii) On November 17, 2021, the Defendants purportedly administered ESWT to an Insured named MP's lumbar spine, right hip, and left hip.  The Defendants then submitted three separate charges to GEICO under CPT code 0101T through the Riaz Ahmad Practice totaling more than $2,100.00.

(ix) On November 23, 2021, the Defendants purportedly administered ESWT to an Insured named LA's cervical spine, lumbar spine, and thoracic spine.  The Defendants then submitted three separate charges to GEICO under CPT code 0101T through the Riaz Ahmad Practice totaling more than $2,100.00.

(x) On December 7, 2021, the Defendants purportedly administered ESWT to an Insured named GR's thoracic spine, lumbar spine, and right knee.  The Defendants then submitted three separate charges to GEICO under CPT code 0101T through the Riaz Ahmad Practice totaling more than $2,100.00.

114. These are only representative examples.  In the claims identified in Exhibits "1"-

"5", the Defendants routinely submitted a separate charge for each body part purportedly treated by the Provider Defendants on a particular date of service.

115.    The fraudulent treatment and billing protocols employed by the Defendants is further illustrated by the formulaic nature in which the services were claimed to have been performed.  More specifically, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

116.    An individual's age, height, weight, general physical condition, location within the vehicle, and location of the impact will affect whether, how, and to what extent an individual is injured in a given automobile accident.

117.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific No-Fault Clinic would routinely require ESWT at or about the same time.

118.    Even so, and in keeping with the fact that the ESWT purportedly performed by the Defendants was not medically necessary and was performed pursuant to a predetermined protocol to maximize profits, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident at or about the same time.

119.    For example:

(i)      On February 20, 2021, three insureds – EV, JS, and CK  – were involved in the same automobile accident. Thereafter, EV, JS, and CK all – incredibly – received ESWT from Community Medical on the same exact date, May 11, 2021.

(ii)     On February 19, 2021, three insureds – MV, AD, and NN – were involved in the same automobile accident.  Thereafter, MV, AD, and NN all – incredibly – received ESWT from Community Medical on the same exact date, March 30, 2021.

(iii)    On June 11, 2021, three insureds – JR, YB, and RR – were involved in the same automobile accident.  Thereafter, JR, YB, and RR all – incredibly –

received ESWT from Community Medical <u>on the same exact date</u>, June 15, 2021.

(iv)    On October 9, 2021, three insureds – MSJ, LCA, and GR – were involved in the same automobile accident. Thereafter, MSJ, LCA, and GR all – incredibly – received ESWT from the Riaz Ahmad Practice <u>on the same exact date</u>, November 23, 2021.

(v)    On September 19, 2021, two insureds – LH and DS – were involved in the same automobile accident. Thereafter, LH and DS both – incredibly – received ESWT from Comfort Care <u>on the exact same date</u>, October 4, 2021.

(vi)    On July 24, 2021, two insureds – KL and VV – were involved in the same automobile accident. Thereafter, KL and VV both – incredibly – received ESWT from the Ahmad Riaz Practice <u>on the same exact date</u>, November 10, 2021.

(vii)    On May 7, 2021, two insureds – SM and NR – were involved in the same automobile accident. Thereafter, SM and NR both – incredibly – received ESWT from DLC Comprehensive <u>on the same exact date</u>, August 31, 2021.

(viii)    On October 31, 2021, two insureds – PJ and KC – were involved in the same automobile accident. Thereafter, PJ and KC both – incredibly – received ESWT from the Riaz Ahmad Practice <u>on the same exact date</u>, November 18, 2021.

(ix)    On April 13, 2021, two insureds – LL and AV – were involved in the same automobile accident.  Thereafter, LL and AV both – incredibly – received ESWT from Community Medical <u>on the same exact date</u>, May 7, 2021.

(x)    On July 3, 2021, two insureds – JG and DV – were involved in the same automobile accident. Thereafter, JG and DV both – incredibly – received ESWT from DLC Comprehensive <u>on the same exact date</u>, October 6, 2021.

120.    These are only representative examples. In many of the claims identified in Exhibits "1" through "5," two or more Insureds who had purportedly been involved in the same underlying automobile accident received ESWT from the Provider Defendants at or about the same time, despite the fact that the Insureds were differently situated.

121.    As with the other Fraudulent Services, billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol, and was designed solely to financially

enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

### 2. The Defendants' Fraudulent Charges for Functional Capacity Evaluation ("FCE") Tests

122.    As with the ESWT, the Defendants also purported to subject many of the Insureds to medically unnecessary Functional Capacity Evaluation ("FCE") tests through Comfort Care and the Riaz Ahmad Practice.

123.    The FCE tests were typically performed at or around the same time as Comfort Care and the Riaz Ahmad Practice purportedly administered ESWT.

124.    The charges for the FCE tests were fraudulent in that the tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements.

125.    The Defendants billed GEICO for the FCE tests through Comfort Care and the Riaz Ahmad Practice under CPT code 97800, typically resulting in a charge of $614.00 per each FCE test that they purported to provide.

126.    An FCE test is a diagnostic test that assesses an individual's physical capacities and functional abilities by matching human performance levels to the demands of a specific occupation or work activity. FCE tests establish the physical level of work an individual can perform and can be useful in determining job placement, job accommodation, or ability to return to work following an injury or illness. FCE tests also can provide objective information regarding functional work ability for use in determination of an individual's occupational disability status.

127.    Pursuant to the Fee Schedule, FCE tests should only be used to determine an individual's ability to assume or return to work.

128.    Specifically, the Fee Schedule states, in pertinent part, the following:

The FCE is utilized for the following purposes:

A)  To determine the level of safe maximal function at the time of maximal medical improvement.

B)  To provide a prevocational baseline of functional capabilities to assist in the vocational rehabilitation process.

C)  To objectively set restrictions and guidelines for return to work.

D)  To determine whether specific job tasks can be safely performed by modification of technique, equipment, or by further training.

E)  To determine whether additional treatment or referral to a work hardening program is indicated.

F)  To assess outcome at the conclusion of a work hardening program.

129.    In addition, the Fee Schedule sets forth certain limits on – among other things – who may perform an FCE test, and the circumstances under which FCE tests may be performed. Specifically, the Fee Schedule provides, in relevant part, that:

(i)     FCE tests may be prescribed only by an authorized physician, nurse practitioner, physician assistant, or podiatrist, or may be requested by the carrier when indicated.

(ii)    FCE tests only may be performed by: (a) a licensed physical therapist; (b) a licensed occupational therapist; or (c) another licensed healthcare provider qualified by his or her scope of practice. Constant supervision of the FCE test by the licensed provider is required.

(iii)   FCE tests – when medically necessary and indicated – may be performed only at the point of maximal medical improvement in the opinion of the attending provider.

(iv)    FCE tests may not be prescribed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

(v)     FCE tests only may be performed where the patient: (a) is preparing to return to a previous job; (b) has been offered a new job; or (c) is working with a rehabilitation provider and a vocational objective is established.

130.    In keeping with the fact that the FCE tests were fraudulent and performed pursuant

to predetermined treatment protocols rather than to benefit any of the Insureds, the examinations purportedly performed prior to the FCE tests often failed to document the Insureds' eligibility upon which the performance of an FCE test would be warranted.

131.   To the extent that anyone conducted medical examinations that assessed the Insureds' eligibility to undergo an FCE test, many of the Insureds to whom Comfort Care and the Riaz Ahmad Practice purported to provide FCE tests were not: (i) preparing to return to a previous job; (ii) been offered a new job; or (iii) working with a rehabilitation provider where a vocational objective was established.

132.   Specifically, in many instances where a FCE test was provided by Comfort Care and the Riaz Ahmad Practice to an Insured – to the extent actually provided at all – the Insureds either: (i) were unemployed at the time when the underlying automobile accidents occurred, and therefore had no "previous job" to return to; (ii) lost no time from work as the result of the underlying automobile accidents, and therefore had no "previous job" to return to; (iii) had not been offered any new employment; and/or (iv) had no "vocational objective" against which their functional capacity needed to be measured.

133.   To conceal the fact that the FCE tests were performed without regard for Insureds' vocational status, and therefore were not reimbursable under the Fee Schedule, the Defendants virtually always omitted any information regarding the Insureds' vocational status from the FCE test reports that they submitted, or caused to be submitted, in support of their FCE test billing.

134.   Further to the fact that the FCE tests were fraudulent and performed pursuant to predetermined treatment protocols rather than to benefit any of the Insureds, the Defendants routinely purported to perform FCE tests on Insureds prior to three months post-injury.

135.   For example:

(i)      On November 6, 2021, AH was involved in an automobile accident. Thereafter, AH was subjected to an FCE test purportedly performed by Comfort Care on November 16, 2021, <u>a mere 10 days after the automobile accident</u>.

(ii)     On September 17, 2021, VN was involved in an automobile accident. Thereafter, VN was subjected to an FCE test purportedly performed by Comfort Care on September 28, 2021, <u>a mere 11 days after the automobile accident</u>.

(iii)    On September 2, 2021, TB was involved in an automobile accident. Thereafter, TB was subjected to an FCE test purportedly performed by Comfort Care on September 27, 2021, <u>a mere 25 days after the automobile accident</u>.

(iv)    On November 9, 2021, KF was involved in an automobile accident. Thereafter, KF was subjected to an FCE test purportedly performed by the Riaz Ahmad Practice on November 30, 2021, <u>a mere 21 days after the automobile accident</u>.

(v)     On November 17, 2021, MM was involved in an automobile accident. Thereafter, MM was subjected to an FCE test purportedly performed by the Riaz Ahmad Practice on December 9, 2021, <u>a mere 22 days after the automobile accident</u>.

136.    These are only representative examples. In many of the claims identified in Exhibits "2" and "5" for the FCE tests purportedly performed by Comfort Care and the Riaz Ahmad Practice, the Defendants purported to perform FCE tests on Insureds prior to three months post-injury, in violation of the Fee Schedule limits.

137.    In keeping with the fact that FCE tests are intended to determine an Insured's ability to commence or return to work, the Fee Schedule provides that FCE tests only may be performed at the point of maximal medical improvement in the opinion of the attending physician.

138.    Because an Insured is unlikely to achieve maximal medical improvement immediately after their accident, the Fee Schedule provides that FCE tests should not be performed prior to three months post-injury unless there is a significant documented change in the status of the patient that justifies earlier utilization.

139.    Because an Insured only can achieve maximal medical improvement from a single accident on a single occasion, FCE tests should be performed only once with respect to any given Insured following any single accident.

140.    To conceal the fact that the FCE tests were provided – to the extent that they were provided at all – without regard for Insureds' medical improvement, and therefore were not reimbursable under the Fee Schedule, the Defendants routinely omitted any information regarding the Insureds' recovery status from the FCE test reports that they submitted, or caused to be submitted, in support of their billing.

141.    Additionally, and in further support of the fact that the Defendants provided FCE tests without regard for an Insured's medical improvement – to the extent the FCE tests were provided at all – virtually every Insured who purportedly received a FCE test from the Defendants continued to receive treatment for their injuries for weeks or months after the FCE test was administered.

142.    In all of the claims identified in Exhibits "2" and "5" for FCE tests, the Defendants falsely represented that the FCE tests were medically necessary, when in fact the FCE tests were part of the Defendants' predetermined fraudulent treatment and billing protocols, and were designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who were subjected to the purported FCE tests.

### 3.    The Defendants' Fraudulent Charges for Transcranial Doppler Testing ("TDT")

143.    As with the ESWT and FCE, the Defendants purported to subject many Insureds to medically unnecessary Transcranial Doppler Testing ("TDT") through Community Medical.

144.    The charges for the TDT were fraudulent in that the tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements.

145.    The Defendants billed for TDT through Community Medical to GEICO under CPT codes 93886, 93890, and 93892, typically resulting in charges of $1,641.79 for each session of TDT that they purported to provide to each patient.

146.    TDT is a technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

147.    TDT typically uses a doppler transducer that enables recording of blood flow velocities within intracranial arteries through selected cranial foramina and thin regions of the skull.  Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

148.    TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

149.    Headaches, dizziness, and head trauma alone are not indications for TDT studies of the intracranial cerebrovascular system.

150.    Rather, TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

(i)      Vasopasm, following a ruptured brain aneurysm;

(ii)     Sickle cell anemia, to determine a patient's risk of stroke;

(iii)    Ischemic stroke;

(iv)    Intracranial stenosis or blockage of the blood vessels;

(v)     Cerebral microemboli; and/or

        (vi)    Patent Foramen Ovale, a hole in the heart that does not close properly after birth, which may provoke embolic stroke.

151.    Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more.

152.    In keeping with the fact that the TDT was medically useless and performed pursuant to predetermined treatment protocols rather than to benefit any of the Insureds subjected to treatment by Community Medical, the medical examinations performed prior to the TDT often failed to screen for the symptoms or signs that would warrant TDT.

153.    To the extent that anyone conducted medical examinations that assessed the Insureds' head pain and neurological symptoms, in virtually every case where the Defendants purported to provide TDT, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

154.    Indeed, in many cases, Insureds who received TDT at Community Medical did not report suffering any sort of head injury in the examination reports provided by the purported treating physician that preceded the TDT.

155.    For example:

        (i)    On April 24, 2021, a patient named CL was purportedly involved in a motor vehicle accident. On April 27, 2021, CL underwent a medical examination at Metro Pain Specialists, P.C., at which CL reported no head injury. On May 25, 2021, CL underwent another medical examination at Tri-Borough NY Medical Practice, P.C., at which CL reported no head injury. Nevertheless, on June 3, 2021, CL underwent TDT with Community Medical.

        (ii)    On January 26, 2021, a patient named BS was purportedly involved in a motor vehicle accident. On January 27, 2021, BS underwent a medical examination at Kalfayan Medical Care PLLC at which BS reported no head injury. Nevertheless, on May 3, 2021, BS underwent TDT with Community Medical.

(iii)    On April 16, 2021, an insured named KW was purportedly involved in a motor vehicle accident. On April 21, 2021, KW underwent a medical examination at Metro Pain Specialists, P.C., at which KW reported no head injury. Nevertheless, on May 26, 2021, KW underwent TDT with Community Medical.

(iv)    On March 25, 2021, an insured named LT was purportedly involved in a motor vehicle accident. On March 30, 2021, LT underwent a medical examination at Metro Pain Specialists, P.C., at which LT reported no head injury.  Nevertheless, on April 6, 2021, LT underwent TDT with Community Medical.

(v)    On May 27, 2021, an insured named AO was purportedly involved in a motor vehicle accident. On May 28, 2021, AO underwent a medical examination with Bedford Medical Services, at which AO did not report a head injury. Nevertheless, on June 2, 2021, AO underwent TDT with Community Medical.

156.    These are only representative examples.  In many of the claims identified in Exhibit "1," Insureds who received TDT at Community Medical did not report suffering any sort of head injury in the examination reports that preceded the TDT.

157.    Moreover, as previously discussed, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

158.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific No-Fault Clinic would routinely require TDT at or about the same time.

159.    Even so, and in keeping with the fact that the TDT purportedly performed by Community Medical was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Community Medical routinely provided TDT to multiple Insureds involved in the same accident at or about the same time.

160.    For example:

(i) On March 11, 2021, two insureds – DP and MC – were involved in the same automobile accident. Thereafter, DP and MC both – incredibly – received TDT from Community Medical <u>on the same exact date</u>, April 13, 2021.

(ii) On April 15, 2021, two insureds – FT and MT – were involved in the same automobile accident. Thereafter, FT and MT both – incredibly – received TDT from Community Medical <u>on the same exact date</u>, April 22, 2021.

(iii) On February 26, 2021, two insureds – JM and GJ – were involved in the same automobile accident. Thereafter, JM and GJ both – incredibly – received TDT from Community Medical <u>on the same exact date</u>, April 6, 2021.

(iv) On March 2, 2021, two insureds – SC and CW – were involved in the same automobile accident. Thereafter, SC and CW both – incredibly – received TDT from Community Medical <u>on the same exact date</u>, June 2, 2021.

(v) On April 18, 2021, two insureds – LR and AC – were involved in the same automobile accident. Thereafter, LR and AC both – incredibly – received TDT from Community Medical <u>on the same exact date</u>, April 22, 2021.

161. These are only representative examples. In many of the claims identified in Exhibit "1," two or more Insureds who were involved in the same underlying automobile accident received TDT from Community Medical at or about the same time, despite the fact that the Insureds were differently situated.

162. Indeed, even had the Insureds displayed symptoms warranting TDT – which they typically did not – in a legitimate clinical setting the practitioner would initially administer a TDT of the intracranial arteries, billed under CPT code 93886, and would only proceed to perform a vasoreactivity test billed under CPT code 93890, or a microemboli study billed under CPT code 93892 if the Insured displayed symptoms warranting that additional testing. Nevertheless, the Defendants purported to provide <u>all three studies on virtually every Insured</u> who received TDT.

163. Additionally, the TDT performed by the Defendants generated "TCD Exam Data," an example of which is below:

TCD Exam Data:
(In the report, the unit of Peak/Mean/Dias is cm/s, Depth's unit is mm, others have no unit)

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 50 | 33 | 24 | 0.80 | 0.52 | 0 44 | 2.08 | 151 | Toward |
| RACA | 62 | 47 | 33 | 26 | 0 64 | 0 45 | 0 08 | 1.81 | 128 | Reverse |
| RPCA | 67 | 47 | 32 | 24 | 0.73 | 0 49 | 0 37 | 1 96 | 135 | Toward |
| LMCA | 52 | 49 | 35 | 28 | 0 60 | 0 43 | 0 26 | 1.75 | 125 | Toward |
| LACA | 62 | 46 | 31 | 24 | 0.70 | 0.48 | 0 01 | 1.92 | 135 | Reverse |
| LPCA | 67 | 49 | 31 | 22 | 0 87 | 0 55 | 0 45 | 2.23 | 128 | Toward |
| ROA | 47 | 40 | 24 | 16 | 1 00 | 0 60 | 0 67 | 2 50 | 160 | Toward |
| LOA | 47 | 48 | 27 | 16 | 1 20 | 0.67 | 0 70 | 3.00 | 229 | Toward |
| RVA | 62 | 46 | 32 | 25 | 0 66 | 0.46 | 0 39 | 1.84 | 128 | Reverse |
| LVA | 62 | 49 | 35 | 28 | 0 60 | 0.43 | 0 35 | 1.75 | 139 | Reverse |
| BA | 75 | 49 | 33 | 25 | 0 73 | 0.49 | 0 05 | 1.96 | 132 | Reverse |
| vmr pre | 52 | 49 | 35 | 28 | 0 60 | 0.43 | 0 41 | 1.75 | 142 | Toward |
| vmr hold | 52 | 44 | 31 | 24 | 0 65 | 0.45 | 0 43 | 1.83 | 155 | Toward |
| vmr after | 52 | 51 | 34 | 25 | 0 77 | 0.51 | 0 05 | 2.04 | 120 | Toward |
| hits | 52 | 45 | 32 | 26 | 0 59 | 0.42 | 0 49 | 1.73 | 135 | Toward |

TCD Conclusion:

164.    The "depth" measurement contained in the "TCD Exam Data" purports to measure the size of each Insured's head, as well as the location of blood vessels therein.

165.    However, virtually every Insured who underwent TDT with Community Medical purportedly had one of several sets of depth measurements, with the majority presenting with identical depth measurements. In other words, according to the "TCD Exam Data" generated by Community Medical, the majority of Insureds who treated with Community Medical had identically sized heads with identically located blood vessels.

166.    For example:

(i)    On April 16, 2021, an Insureds named AB was involved in a motor vehicle accident. On April 27, 2021, AB received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(ii)    On April 16, 2021, an Insured named DF was involved in a motor vehicle accident. On April 27, 2021, DF received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(iii)     On February 24, 2021, an Insured named AP was involved in a motor vehicle accident. On April 7, 2021, AP received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(iv)     On January 26, 2021, an Insured named RL was involved in a motor vehicle accident. On April 26, 2021, RL received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(v)     On April 24, 2021, an Insured named CS was involved in a motor vehicle accident. On June 3, 2021, CS received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(vi)     On March 25, 2021, an Insured named AH was involved in a motor vehicle accident. On April 6, 2021, AH received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(vii)     On April 24, 2021, an Insured named JS was involved in a motor vehicle accident. On May 12, 2021, JS received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(viii)     On March 18, 2021, an Insured named CF was involved in a motor vehicle accident. On April 7, 2021, CF received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(ix)     On March 18, 2021, an Insured named JD was involved in a motor vehicle accident. On April 7, 2021, JD received TDT from Community Medical. As

a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

(x)   On February 24, 2021, an Insured named GB was involved in a motor vehicle accident. On April 7, 2021, GB received TDT from Community Medical. As a result of that TDT, Community Medical generated "TCD Exam Data" with the following depth values:

52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, and 52.

167.   It is extremely improbable – to the point of impossibility, that such a large number of Insureds who treated with Community Medical would present with identical depth measurements, despite being differently situated.

168.   As with the other Fraudulent Services, the TDT was part of the Defendants' fraudulent treatment and billing protocol, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who were subjected to these purported tests.

**4.     The Defendants' Fraudulent Charges for Vestibular Function Testing ("VFT")**

169.   The Defendants also purported to subject many Insureds to medically unnecessary vestibular function testing ("VFT") through Community Medical.

170.   The charges for the VFT were fraudulent in that the VFT was medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a predetermined fraudulent treatment protocol and illegal kickbacks that the Defendants paid to the Clinics.

171.   The Defendants billed the VFT to GEICO through Community Medical under CPT codes 92533, 92540, 92546, and 92548, typically resulting in charges of $499.81 for each session of VFT that they purported to provide.

172.   VFT consists of tests that can be used to determine the cause of a patient's vertigo

or balance disorder in cases where there are no readily recognizable contributing factors to the patient's condition.

173.    In other words, VFT is not used to confirm the existence of dizziness or balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ear, nose and throat ("ENT") or neurological medical examination. Generally, VFT is employed to determine the source of the generation of vertigo (i.e., the inner ear or brain).

174.    VFT involves the recording of involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras. The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

175.    There are four main components to VFT: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the source of vertigo, which in turn helps the physician assess the cause of the balance disorder.

176.    To properly administer VFT, the patient must be prepared appropriately. This preparation typically requires: (i) 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); (ii) 24 hours of abstention from

stimulants such as caffeine, as well as alcohol; and (iii) three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the patient's eye movements.

177.    VFT should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma. A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a physical examination, including an ENT and neurological examination, followed by conservative care. If the patient does not respond to conservative care, an MRI of the brain may be ordered. If a patient does not respond to conservative care, and the brain MRI is negative, the patient may be evaluated by an ENT or neurologist to determine if VFT is warranted.

178.    Virtually none of the insureds were referred to Community Medical by an ENT or a neurologist, many did not undergo conservative care prior to undergoing VFT with Community Medical, and few – if any – received a brain MRI prior to undergoing VFT with Community Medical.

179.    Notwithstanding the need for pre-test preparations or independent evaluations to determine medical necessity of the VFT, the Insureds were referred to Community Medical and received the VFT during their initial visits with Community Medical without receiving the appropriate pre-test preparation or evaluations for medical necessity.

180.    Instead, Community Medical performed the VFT pursuant to referrals issued as part of a predetermined fraudulent treatment protocol.

181.    To the extent that anyone conducted medical examinations that assessed the Insureds' neurological symptoms, many of the Insureds to whom Community Medical purported to provide VFT did not report experiencing dizziness, imbalance, or vertigo in the examination

reports that preceded the VFT.

182.    For example:

(i)     On May 4, 2021, a patient named HS was involved in a motor vehicle accident. On May 12, 2021, HS underwent a medical examination at Bedford Medical Services at which HS reported no dizziness, imbalance, or vertigo. Nevertheless, on May 18, 2021, HS underwent VFT with Community Medical.

(ii)    On April 16, 2021, a patient named RT was involved in a motor vehicle accident. On April 21, 2021, RT underwent a medical examination at Metro Pain Specialists, P.C. at which HS reported no dizziness, imbalance, or vertigo. Nevertheless, on May 12, 2021, RT underwent VFT with Community Medical.

(iii)   On May 3, 2021, a patient named JY was involved in a motor vehicle accident. On May 7, 2021, JY underwent a medical examination at Bedford Medical Services at which JY reported no dizziness, imbalance, or vertigo. Nevertheless, on May 25, 2021, JY underwent VFT with Community Medical.

(iv)    On May 4, 2021, a patient named DR was involved in a motor vehicle accident. On May 12, 2021, DR underwent a medical examination at Bedford Medical Services at which DR reported no dizziness, imbalance, or vertigo. Nevertheless, on May 25, 2021, DR underwent VFT with Community Medical.

(v)     On April 16, 2021, a patient named AB was involved in a motor vehicle accident. On April 22, 2021, AB underwent a medical examination at Pak Hong Sik M.D. Medical Care, P.C. at which AB reported no dizziness, imbalance, or vertigo. Nevertheless, on April 27, 2021, AB underwent VFT with Community Medical.

183.    These are only representative examples. In many of the claims identified in Exhibit "1," the Insureds who received VFT with Community Medical did so despite exhibiting no dizziness, imbalance, or vertigo.

184.    Moreover, as previously discussed, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

185.    It is extremely improbable – to the point of impossibility – that multiple Insureds

involved in the same automobile accident would routinely require VFT at or about the same time.

186.    Even so, and in keeping with the fact that the VFT purportedly performed by Community Medical was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Community Medical routinely provided VFT to multiple Insureds involved in the same accident at or about the same time.

187.    For example:

(i)     On May 14, 2021, four insureds – NW, LW, TW, and FW – were involved in the same automobile accident. Thereafter, NW, LW, TW, and FW all – incredibly – received VFT from Community Medical <u>on the same exact date</u>, June 2, 2021.

(ii)    On May 11, 2021, two insureds – ZM and GM – were involved in the same automobile accident. Thereafter, ZM and GM both – incredibly – received VFT from Community Medical <u>on the same exact date</u>, May 18, 2021.

(iii)   On April 15, 2021, two insureds – FT and MT – were involved in the same automobile accident. Thereafter, FT and MT both – incredibly – received VFT from Community Medical <u>on the same exact date</u>, April 22, 2021.

(iv)    On March 11, 2021, two insureds – MC and DP – were involved in the same automobile accident.  Thereafter, MC and DP both – incredibly – received VFT from Community Medical <u>on the same exact date</u>, April 13, 2021.

(v)     On February 26, 2021, two insureds – JM and GJ – were involved in the same automobile accident.  Thereafter, JM and GJ both – incredibly – received VFT from Community Medical <u>on the same exact date</u>, April 6, 2021.

188.    These are only representative examples. In many of the claims identified in Exhibit "1," two or more Insureds who had been involved in the same underlying accident received VFT from Community Medical at or about the same time, despite the fact that the Insureds were differently situated.

189.    Even if an Insured reported the existence of some general form of dizziness or balance disorder, the VFT that supposedly are provided by the Defendants were medically

unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the examinations routinely were purportedly provided prior to the VFT, and the patient histories that purported were taken during every initial examination/consultation and follow-up examination.

190.    In keeping with the fact that the VFT that purportedly were provided by the Defendants were medically unnecessary, upon information and belief no physician or healthcare provider associated with the Defendants properly prepared the Insureds for the tests. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

191.    Because the Defendants knew that the VFT was unreliable and useless, the data that the Defendants purported to obtain from the tests were virtually never incorporated into any Insured's treatment plan. Even in cases where the VFT returned a positive result, the Insureds rarely – if ever – underwent any form of vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

192.    In keeping with the fact that the VFT tests were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, virtually all of the VFT reports contain preprinted, boilerplate language, stating "Chief Complaints: The p[atien]t is c/o recurrent episodes of dizziness and headaches" even though many of the patients who received VFT from Community Medical did not actually complain of recurrent episodes of dizziness.

193.    In further keeping with the fact that the VFT was unreliable and useless, to the extent the Defendants generated test reports as a result of the VFT, the test reports virtually always contained the following preprinted boilerplate test results:

Oculomotor Tests:
1. Visual pursuit- Smooth accurate pursuit movements with normal gain.
2. Saccades - Normal peak velocity and normal delay.
3. Visual optokinetic Test - OPK nystagmus is rhythmic, with normal and symmetric waveform morphology.
Gaze:
1. Spontaneous Nystagmus - not present.
2. Gaze Evoked Nystagmus - there was no nystagmus appears in any position of gaze.
Rotational tests- Active head rotation tests (AHR) in the horizontal and vertical directions were within normal thresholds.
Torsion Tests: - Normal waveform morphology.
Positioning and Positional Subtests:
Dix-Hallpikes (left, right): Negative for Hallpike findings and benign paroxysmal positioning vertigo (BPPV) diagnosis. No nystagmus evoked.
Positional Tests: Positional testing was unremarkable in all head and body positions.
Bithermal Caloric Tests: The responses to warm and cool caloric were without unilateral weakness bilaterally. Caloric fixation suppression was normal for all four irrigations.

194.    Similarly, and in further keeping with the fact that the VFT were unreliable and useless, to the extent the Defendants generated test reports as a result of the VFT, the test reports virtually always contained the following preprinted boilerplate Summary and Impression, and Recommendations:

Summary and Impression: Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

Recommendations: Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

195.    Moreover, despite the fact that the reports virtually always recommend balance rehabilitation in the preprinted recommendations, virtually none of the Insureds who received VFT with Community Medical underwent balance rehabilitation.

196.    As with the other Fraudulent Services, the VFT was part of the Defendants' predetermined fraudulent treatment and billing protocols, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who were subjected to the purported tests.

### 5.      The Defendants' Fraudulent Charges for Spinal Ultrasound Testing

197.    As with the ESWT, FCE, TDT, and VFT, the Defendants also purported to subject many Insureds to medically unnecessary and useless SUT (i.e, spinal ultrasound testing) through Community Medical.

198.    The charges for the ultrasound testing were fraudulent in that the tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements.

199.    The Defendants billed GEICO for SUT through Community Medical under CPT codes 76800, 76881, and 76999, typically resulting in charges between $161.77 to $323.54 for each ultrasound test they purported to provide.

200.    Ultrasound testing is an imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves that are passed into the body.  Physicians commonly use this technique for a number of appropriate medical imaging purposes, such as the investigation of abdominal and pelvic masses, cardiac echocardiography, and prenatal fetal imaging. There is no medical support for the use of spinal ultrasound testing in the evaluation of patients with back pain or radicular symptoms.

201.    In keeping with the fact that the Defendants provided the ultrasound testing – to the extent that it was provided at all – pursuant to a predetermined fraudulent protocol, the Defendants purportedly provided SUT to the Insureds. The SUT was worthless and of no clinical value in the manner used by Defendants to purportedly diagnose and treat Insureds presenting with back pain or radicular symptoms resulting from motor vehicle accidents.

202.    The American Institute of Ultrasound Medicine ("AIUM"), which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of ultrasound medicine, determined in relevant part, that: "the use of non-operative spinal/paraspinal ultrasound in adults…for diagnostic evaluation…including pain or radiculopathy syndromes, and for monitoring of therapy has no proven clinical utility." A copy of the AIUM determination is annexed hereto as Exhibit "6."

203.    Similarly, the American Academy of Neurology ("AAN") issued a report that evaluated the use of SUT for diagnosing back pain and radicular disorders. The report concluded that there is no support for the use of diagnostic ultrasound in the evaluation of patients with back pain or radicular symptoms. The procedure cannot be recommended for use in the clinical evaluation of such patients. A copy of the AAN report is annexed hereto as Exhibit "7."

204.    Consistent with the above-referenced authorities, the New York State Workers' Compensation Board Mid and Low Back Injury Medical Treatment Guidelines also state that "Diagnostic ultrasound is not recommended for patients with back pain." A copy of the New York State Workers' Compensation Board Mid and Low Back Injury Medical Treatment Guidelines are annexed hereto as Exhibit "8."

205.    Despite the lack of medical value or medical utility in the context of No-Fault automobile accident victims suffering spinal/paraspinal injuries, the Defendants routinely submitted or caused to be submitted fraudulent billing to GEICO for spinal and paraspinal ultrasound testing through Community Medical.

206.    As with the other Fraudulent Services, the medically useless SUT was part of the Defendants' predetermined fraudulent treatment and billing protocols, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who were subjected to

the purported tests.

### 6.    The Defendants' Fraudulent Charges for Consultations

207.    As part of the predetermined fraudulent treatment protocol, the Defendants purported to subject many of the Insureds in the claims identified in Exhibit "3" to medically unnecessary and fraudulent consultations that they referred to as "Initial Neurodiagnostic Evaluations" through DLC Comprehensive.

208.    The Initial Neurodiagnostic Evaluations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" that served to justify the Defendants' concurrent purported performance of medically unnecessary and illusory nerve conduction velocity ("NCV") testing and electromyography ("EMG") studies through DLC Comprehensive.

209.    The charges for the consultations – or Initial Neurodiagnostic Evaluations – were fraudulent in that the consultations were not medically necessary, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements, not to treat or otherwise benefit Insureds.

210.    The Defendants billed GEICO for the consultations through DLC Comprehensive under CPT code 99245, typically resulting in a charge of $410.08 for each Initial Neurodiagnostic Evaluation that they purported to provide.

211.    In keeping with the fact that the Initial Neurodiagnostic Evaluations were performed by the Defendants pursuant to the illegal kickback and referral arrangements with the various No-Fault Clinics in coordination with John Doe Defendants "1" through "10," the Defendants virtually always purported to perform the consultations through DLC Comprehensive at the No-Fault Clinic locations from where they obtained their patient referrals rather that any standalone practice.

212.     Additionally, the Initial Neurodiagnostic Evaluations performed through DLC Comprehensive – to the extent that they were performed at all – were often not performed by Dr. Ahmad or an employee of DLC Comprehensive, but instead were performed by physicians or technicians who were independent contractors, not affiliated with or supervised by Dr. Ahmad.

213.     What is more, the Defendants' charges for the consultations were fraudulent in that they misrepresented the extent of the examinations.

214.     For example, in virtually every claim identified in Exhibit "3" for consultations charged to GEICO under CPT code 99245, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining practitioner spent with the Insureds or the Insured's families.

215.     The use of CPT code 99245 typically requires that a practitioner spend 80 minutes of face-to-face time with the Insured and/or the Insured's family.

216.     Though the Defendants typically billed for their consultations under CPT code 99245, no practitioner or other healthcare professional associated with DLC Comprehensive spent even 30 minutes – let alone 80 minutes – on a consultation.

217.     Rather, the consultations in the claims identified in Exhibit "3" rarely lasted longer than 10 to 15 minutes.

218.     In keeping with the fact that the Initial Neurodiagnostic Evaluations rarely lasted more than 10 to 15 minutes, the Defendants used simple checklist forms in purporting to conduct the consultations billed through DLC Comprehensive.

219.     The checklist forms that the Defendants used in conducting the consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

220.    Indeed, all that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

221.    These interviews and examinations did not require the Defendants to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative consultations.

222.    In addition, pursuant to the Fee Schedule, when the Defendants submitted or caused to be submitted charges for the consultations under CPT code 99245 through DLC Comprehensive, they fraudulently represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; (iii) they engaged in medical decision making of "high complexity;" and (iv) the patient presenting was of "moderate to high severity" as required under CPT code 99245.

223.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

224.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

225.    In fact, the Defendants did not take a "comprehensive" patient history from the Insureds they purported to treat during the consultations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

226.    Rather, after purporting to provide the consultations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

227.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) the EMG/NCV that the Defendants purported to provide and then billed to GEICO and other insurers.

228.    Furthermore, pursuant to the CPT Assistant, a consultation billed under CPT code 99245 requires a "comprehensive" physical examination, which requires that the healthcare services provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single organ system.

229.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

230.    In fact, the Defendants did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.  For instance, Defendants did not conduct any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

231.    Furthermore, in the claims for consultations under CPT code 99245 that are identified in Exhibit "3," the Defendants routinely misrepresented that they engaged in "high complexity" medical decision-making during the purported performance of the examinations.

232.     To the limited extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as a result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

233.     The treatment of soft tissue injuries such as sprains and strains does not require any legitimate, high-complexity medical decision-making.

234.     To the extent that the purported consultations were conducted in the first instance, the Defendants provided a substantially similar laundry list of predetermined soft tissue injury "diagnoses" for every Insured.

235.     Then, based upon these supposed "diagnoses," the Defendants directed virtually every Insured to undergo additional, medically unnecessary Fraudulent Services – including EMG/NCV purportedly provided by the Defendants themselves – regardless of the Insureds' true individual circumstances.

236.     For example:

(i)     On March 29, 2021, an Insured named RG was involved in an automobile accident. To the extent that RG experienced any health problems at all as the result of her minor accident, they were of low or minimal severity (*e.g.*, minor soft tissue sprains and strains), and did not require any highly complex medical decision-making. Even so, on September 27, 2021, the Defendants purported to provide a consultation to RG through DLC Comprehensive. The Defendants did not consider any significant number of diagnoses or management options in connection with the purported consultation. Furthermore, neither RG's putative presenting problems, nor the treatment plan provided by the Defendants, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by the Defendants consisted of medically unnecessary EMG/NCV to be performed by the Defendants themselves, a pain management consultation, orthopedic consultation, and a generic recommendation for a follow-up consultation with the patient's referring physician in 4-6 weeks – none of which was health or life-threatening if properly administered. Even so, the Defendants billed GEICO for the purported consultation using CPT code 99245, thereby falsely representing that the Defendants engaged in legitimate "high complexity" medical decision-making during the purported consultation.

(ii)     On June 14, 2021, an Insured named AV was involved in an automobile accident. To the extent that AV experienced any health problems at all as the result of her minor accident, they were of low or minimal severity (*e.g.*, minor soft tissue sprains and strains), and did not require any highly complex medical decision-making. Even so, on September 3, 2021, the Defendants purported to provide a consultation to AV through DLC Comprehensive. The Defendants did not consider any significant number of diagnoses or management options in connection with the purported consultation.  Furthermore, neither AV's putative presenting problems, nor the treatment plan provided by the Defendants, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by the Defendants consisted of medically unnecessary EMG/NCV to be performed by the Defendants themselves, physical therapy, a pain management consultation, an orthopedic consultation, the avoidance of strenuous activity, and a generic recommendation for a follow-up consultation with the patient's referring physician in 4-6 weeks – none of which was health or life-threatening if properly administered. Even so, the Defendants billed GEICO for the purported consultation using CPT code 99245, thereby falsely representing that the Defendants engaged in legitimate "high complexity" medical decision-making during the purported consultation.

(iii)    On September 8, 2021, an Insured named YA was involved in an automobile accident. To the extent that YA experienced any health problems at all as the result of her minor accident, they were of low or minimal severity (*e.g.*, minor soft tissue sprains and strains), and did not require any highly complex medical decision-making. Even so, on October 8, 2021, the Defendants purported to provide a consultation to YA through DLC Comprehensive. The Defendants did not consider any significant number of diagnoses or management options in connection with the purported consultation. Furthermore, neither YA's putative presenting problems, nor the treatment plan provided by the Defendants, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by the Defendants consisted of medically unnecessary EMG/NCV to be performed by the Defendants themselves, an orthopedic consultation, and a generic recommendation for a follow-up consultation with the patient's referring physician in 4-6 weeks – none of which was health or life-threatening if properly administered. Even so, the Defendants billed GEICO for the purported consultation using CPT code 99245, thereby falsely representing that the Defendants engaged in legitimate "high complexity" medical decision-making during the purported consultation.

(iv)     On September 12, 2021, an Insured named JP was involved in an automobile accident. To the extent that JP experienced any health problems

at all as the result of his minor accident, they were of low or minimal severity (*e.g.*, minor soft tissue sprains and strains), and did not require any highly complex medical decision-making. Even so, on October 7, 2021, the Defendants purported to provide a consultation to JP through DLC Comprehensive. The Defendants did not consider any significant number of diagnoses or management options in connection with the purported consultation. Furthermore, neither JP's putative presenting problems, nor the treatment plan provided by the Defendants, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by the Defendants consisted of medically unnecessary EMG/NCV to be performed by the Defendants themselves, physical therapy, a pain management consultation, and the avoidance of strenuous activity. Even so, the Defendants billed GEICO for the purported consultation using CPT code 99245, thereby falsely representing that the Defendants engaged in legitimate "high complexity" medical decision-making during the purported consultation.

(v)     On July 14, 2021, an Insured named TW was involved in an automobile accident. To the extent that TW experienced any health problems at all as the result of his minor accident, they were of low or minimal severity (*e.g.*, minor soft tissue sprains and strains), and did not require any highly complex medical decision-making. Even so, on August 11, 2021, the Defendants purported to provide a consultation to TW through DLC Comprehensive. The Defendants did not consider any significant number of diagnoses or management options in connection with the purported consultation. Furthermore, neither TW's putative presenting problems, nor the treatment plan provided by the Defendants, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by the Defendants consisted of medically unnecessary EMG/NCV to be performed by the Defendants themselves, physical therapy, a pain management consultation, and the avoidance of strenuous activity – none of which was health or life-threatening if properly administered. Even so, the Defendants billed GEICO for the purported consultation using CPT code 99245, thereby falsely representing that the Defendants engaged in legitimate "high complexity" medical decision-making during the purported consultation.

237.     These are only representative examples. In virtually every claim identified in Exhibit "3" for the consultations billed under CPT code 99245, the Defendants falsely represented that their putative consultations involved medical decision-making of "high complexity," when in actuality the purported consultations did not involve any legitimate decision-making at all.

238.   In keeping with the fact that the Defendants' putative "diagnoses" were phony, and in keeping with the fact that their putative consultations involved no legitimate medical decision-making at all, the Defendants issued substantially identical, phony "diagnoses" on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

239.   For example:

(i)   On June 14, 2021, two Insureds, AV and DR, were involved in the same automobile accident. Thereafter, AV and DR both – incredibly – presented on the exact same date, September 3, 2021, to DLC Comprehensive for purported consultations by the Defendants. AV and DR were in different physical condition, experienced the impact from different locations in the vehicle, and suffered different minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative consultations, the Defendants provided AV and DR with substantially identical "diagnoses" and recommended a substantially identical course of treatment for both of them, including medically unnecessary EMG/NCV – both of which were purportedly performed by the Defendants on both Insureds later that same day.

(ii)   On September 12, 2021, two Insureds, RL and JP, were involved in the same automobile accident. Thereafter, RL and JP both – incredibly – presented on the exact same date, October 7, 2021, to DLC Comprehensive for purported consultations by the Defendants. RL and JP were in different physical condition, experienced the impact from different locations in the vehicle, and suffered different minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative consultations, the Defendants provided RL and JP with substantially identical "diagnoses" and recommended a substantially identical course of treatment for both of them, including medically unnecessary EMG/NCV – both of which were purportedly performed by the Defendants on both Insureds later that same day.

(iii)   On September 8, 2021, two Insureds, RR and YA, were involved in the same automobile accident. Thereafter, RR and YA both – incredibly – presented on the exact same date, October 8, 2021, to DLC Comprehensive for purported consultations by the Defendants. RR and YA were in different physical condition, experienced the impact from different locations in the vehicle, and suffered different minor injuries in the accident, to the extent

that they suffered any injuries at all. Even so, at the conclusion of the putative consultations, the Defendants provided RR and YA with substantially identical "diagnoses" and recommended a substantially identical course of treatment for both of them, including medically unnecessary EMG/NCV – both of which were purportedly performed by the Defendants on both Insureds later that same day.

(iv)     On July 10, 2021, two Insureds, SS and RS, were involved in the same automobile accident. Thereafter, SS and RS both – incredibly – presented on the exact same date, August 23, 2021, to DLC Comprehensive for purported consultations by the Defendants. SS and RS were in different physical condition, experienced the impact from different locations in the vehicle, and suffered different minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative consultations, the Defendants provided SS and RS with substantially identical "diagnoses" and recommended a substantially identical course of treatment for both of them, including medically unnecessary EMG/NCV – both of which were purportedly performed by the Defendants on both Insureds later that same day.

(v)      On August 28, 2021, two Insureds, RA and LR, were involved in the same automobile accident. Thereafter, RA and LR both – incredibly – presented on the exact same date, October 8, 2021, to DLC Comprehensive for purported consultations by the Defendants. RA and LR were in different physical condition, experienced the impact from different locations in the vehicle, and suffered different minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative consultations, the Defendants provided RA and LR with substantially identical "diagnoses" and recommended a substantially identical course of treatment for both of them, including medically unnecessary EMG/NCV – both of which were purportedly performed by the Defendants on both Insureds later that same day.

240.     These are only representative examples. In the claims for consultations that are identified in Exhibit "3," the Defendants routinely issued substantially identical "diagnoses" on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds – including medically unnecessary EMG/NCV purportedly provided by the Defendants themselves – despite the fact that the Insureds were differently situated.

## 7. The Defendants' Fraudulent Charges for Electrodiagnostic Testing ("EDX")

241.    As previously discussed, and as set forth in Exhibit "3," the Defendants used their fraudulent Initial Neurodiagnostic Evaluations to justify subjecting many Insureds to a series of medically unnecessary and useless nerve conduction velocity ("NCV") and electromyography ("EMG") tests (collectively, "EDX" tests) billed to GEICO through DLC Comprehensive.

242.    The Defendants billed GEICO for EDX tests through DLC Comprehensive under CPT codes 95905, 95907, and 95886 , typically resulting in charges between $86.86 to $809.00 for each set of EDX tests that they purported to provide.

243.    The charges for EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant to the kickbacks that the Defendants paid at the Clinics and the predetermined fraudulent protocols designed solely to financially enrich the Defendants rather than to treat or otherwise benefit the Insureds.

### a. The Human Nervous System and Electrodiagnostic Testing

244.    The human nervous system is composed of the brain, spinal code, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

245.    Two primary functions of the nervous system are to: (i) collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain; and (ii) transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

246.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous

system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

247.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

248.    NCV tests and EMG tests are forms of electrodiagnostic tests which were purportedly provided by the Defendants because such testing was medically necessary to determine whether the Insureds had radiculopathies.

249.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

250.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations; the American Academy of Neurology, and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "9."

**b.    The Fraudulent NCV Tests**

251.    Nerve conduction velocity ("NCV") tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the

nerve to depolarize. The depolarization or "firing" of the nerve is transmitted, measured, and recorded using electrodes attached to the surface of the skin.

252.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

253.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

254.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

255.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies are generally used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV tests are designed to evaluate nerve conduction in nerves within a limb.

256.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

257.    In an attempt to extract the maximum billing out of each Insured who purportedly received NCV tests, the Defendants, through DLC Comprehensive, routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

258.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide to each Insured: (i) NCV tests of at least 16 motor and sensory nerves; and (ii) at least two H-reflex studies.

259.    Defendants routinely purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds had radiculopathies or any other medical condition.

260.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

261.    In a legitimate clinical setting, this decision is determined based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

262.    Thus, the nature and number of the peripheral nerves as well as the type of nerve fibers tested with NCV tests should vary from one patient to the next. This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCV tests] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

263.    This concept also is emphasized in the CPT Assistant, which states that "[p]re-set protocols automatically testing a large number of nerves are not appropriate."

264.    Even so, the Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

265.    Instead, in many instances, they purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the claims for EMG/NCV identified in Exhibit "3" pursuant to predetermined fraudulent treatment protocols.

266.    Though the NCV tests are allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, the Defendants did not perform adequate neurological histories and examinations to create a foundation for the NCV testing. In actuality, the NCV tests were provided to the Insureds – to the extent that they were provided at all – as part of the predetermined, fraudulent treatment protocols designed to maximize the billing that could be submitted for each Insured.

267.    The cookie-cutter approach to the NCV tests that Defendants purported to provide to Insureds was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

c.      **The Fraudulent EMG Tests**

268.    As part of their predetermined fraudulent treatment and billing protocols, the Defendants also purported to provide medically unnecessary electromyography ("EMG") tests to virtually every Insured who received NCV tests.

269.    EMG tests involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such

muscle. The electrical activity in each muscle tested is then compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

270.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

271.    The Defendants purported to provide and/or perform EMG tests on Insureds to determine whether the Insureds suffered from radiculopathies. In actuality, the EMG tests were provided – to the extent they were provided at all – as part of the Defendants' predetermined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

272.    There are many different muscles in the arms and legs that can be tested using EMG tests. A healthcare provider's decision as to the number of limbs and which muscles to test in each limb should be tailored to each Insured's unique circumstances.

273.    In a legitimate clinical setting, this decision is based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained from the EMG tests as they are performed on each specific muscle.

274.    As a result, the quantity of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient to patient.

275.    In most cases, the Defendants did not tailor the EMG tests that they purported to perform to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs on each of the patients, without regard for the patients' individual presentation.

276.     Furthermore, even if there was any need for the EMG tests, the nature and number of the EMG tests that the Defendants purported to provide and/or perform often grossly exceeded the maximum number of limbs tested (i.e., two limbs) that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

277.     In fact, the Defendants routinely purported to perform EMG tests on all four limbs on the Insureds in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO, solely to maximize the profits that Defendants could reap from each Insured.

278.     In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the Defendants' EMG tests were virtually never incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

279.     Further to the fact that the Defendants performed the Fraudulent Services pursuant to fraudulent, predetermined treatment and billing protocols designed solely to maximize profit, the Defendants virtually always performed or purported to perform the NCV tests and EMG tests immediately following the consultation that they performed through DLC Comprehensive.

280.     A proper neurological history and consultation followed by a thoroughly conducted four-limb EMG and NCV test would require the Defendants to spend at least two hours with each patient.

281.     The fact that each of the patients purportedly subjected to the fraudulent NCV tests and EMG tests set aside two hours to receive a consultation and NCV tests and EMG tests indicates that either: (i) the patients knew in advance of the visit that they were to receive the NCV tests and EMG tests because the NCV tests and EMG tests are rendered pursuant to a predetermined treatment protocol; or (ii) the Fraudulent Services were not actually performed as billed.

**D.      The Defendants' Fraudulent Billing for Services Provided by Independent Contractors**

282.    The Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of the Provider Defendants seeking payment for services performed by independent contractors, specifically per diem physicians and technicians who performed the Fraudulent Services.

283.    Under the No-Fault Laws, professional entities are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional entities, themselves, or by their employees.

284.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional entities are not entitled to receive reimbursement under the New York No-Fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

285.   The bills submitted to GEICO by the Defendants routinely included charges for Fraudulent Services that were performed by physicians or technicians other than Dr. Ahmad and who had no employment relationship with Dr. Ahmad and the Provider Defendants.

286.   Consistent with the Defendants' engagement in a fraudulent scheme and operation of the Provider Defendants on an itinerant basis, the Defendants treated all of the physicians and technicians who performed the Fraudulent Services on behalf of the Provider Defendants as independent contractors and not direct employees of the Provider Defendants.

287.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants worked part-time for the Provider Defendants.

288.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants followed irregular schedules based on their own availability and individual desires to perform services for the Provider Defendants or had their schedules set by John Doe Defendants "1" through "10."

289.   The physicians and technicians working under the names of the Provider Defendants did not exclusively provide services for the Provider Defendants.

290.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants utilized their own equipment when they rendered, or purported to render, services on behalf of the Provider Defendants.

291.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants paid for their own malpractice insurance.

292.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants paid their own personal expenses, including gas and travel expenses, without receiving reimbursement from the Provider Defendants.

293.   The physicians and technicians that rendered, or purported to render, services for or on behalf of the Provider Defendants worked without any supervision by Dr. Ahmad.

294.   For example, Joseph Dorsten, D.O. and Roy Shanon, M.D. – who are identified on virtually every VFT and TDT bill submitted to GEICO by Community Medical as the sole treating physicians –are independent contractors who have purported to provide healthcare services for several other medical professional corporations, including but not limited to Lifeline Medical Imaging, P.C. which Dr. Dorsten purports to own.

295.   Moreover, virtually all of the Defendants' billing submissions to GEICO through the Ahmad Riaz Practice and the Riaz Ahmad Practice represent that the Fraudulent Services were provided by Dr. Ahmad.

296.   However, this representation is belied by the volume of GEICO Insureds purportedly treated by the Ahmad Riaz Practice and the Riaz Ahmad Practice at a myriad of different locations throughout the New York metropolitan area on a daily basis.

297.   For example:

(i)     On November 10, 2021, Dr. Ahmad purportedly performed ESWT through the Ahmad Riaz Practice and the Riaz Ahmad Practice on over 30 different GEICO Insureds at eight different locations in three different boroughs.

(ii)    On November 17, 2021, Dr. Ahmad purportedly performed ESWT through the Ahmad Riaz Practice and the Riaz Ahmad Practice on over 45 different GEICO Insureds at seven different locations in three different boroughs.

(iii)   On November 18, 2021, Dr. Ahmad purportedly performed ESWT through the Ahmad Riaz Practice and the Riaz Ahmad Practice on over 40 different GEICO Insureds at seven different locations in three different boroughs.

(iv)    On November 22, 2021, Dr. Ahmad purportedly performed ESWT through the Ahmad Riaz Practice and the Riaz Ahmad Practice on over 50 different GEICO Insureds at twelve different locations in three different boroughs.

(v)     On November 23, 2021, Dr. Ahmad purportedly performed ESWT through the Ahmad Riaz Practice and the Riaz Ahmad Practice on over 40 different GEICO Insureds at ten different locations in three different boroughs.

298.    These are only representative examples.  On many of the dates of service listed in Exhibits "4" and "5", Dr. Ahmad purported to treat a high volume of GEICO Insureds at many different locations throughout New York City through the Ahmad Riaz Practice and the Riaz Ahmad Practice, which was not physically possible or likely to have happened on each single date of service.

299.    To the extent that they were performed in the first instance, all of the Fraudulent Services rendered by the physicians and technicians other than Dr. Ahmad were rendered by physicians and technicians treated as independent contractors.

300.    For example, the Defendants:

(i)     paid the physicians and technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians and technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the physicians and technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians and technicians;

(v)     failed to withhold federal, state, or city taxes on behalf of the physicians and technicians;

(vi)    compelled the physicians and technicians to pay for their own malpractice insurance at their own expense;

(vii)   permitted the physicians and technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the physicians and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)    failed to cover the physicians and technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians and technicians were independent contractors.

301.    By electing to treat the physicians and technicians as independent contractors, the Defendants realized significant economic benefits. For instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the physicians and technicians.

302.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement.

303.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

304.    Because the physicians and technicians were independent contractors when they performed the Fraudulent Services, the Provider Defendants never had any right to bill or collect No-Fault Benefits in connection with those services.

**III.** **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

305.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Provider Defendants were not entitled to receive payment.

306.   The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the Provider Defendants were false and misleading in the following material respects:

(i)     The NF-3, HCFA-1500 forms, and supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services – to the extent provided at all – were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)    The NF-3, HCFA-1500 forms, and supporting documentation submitted to GEICO by and on behalf of the Provider Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)    With the exception of the NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Dr. Ahmad, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

**IV.**    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

307.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

308.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

309.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that the Defendants were submitting voluminous and inflated billing for medically unnecessary services effectuated through kickbacks for patient referrals.

310.    Additionally, the Defendants entered into complex financial arrangements with one another and the No-Fault Clinics that were designed to – and did – conceal the fact that the Defendants were operating a single, large-scale fraudulent scheme and unlawfully exchanging kickbacks for patient referrals.

311.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to a predetermined fraudulent treatment protocol designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

312.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians and technicians associated with the Provider Defendants in order to prevent GEICO from discovering that the physicians and technicians

performing many of the Fraudulent Services were actually independent contractors and not employed by the Provider Defendants.

313.   The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

314.   The Defendants' collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different Clinics located throughout the metropolitan area.

315.   GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.  GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,300,000.00 based upon the fraudulent charges.

316.   Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Dr. Ahmad and the Provider Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

317.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

318.     There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $3,200,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO under the names of the Provider Defendants.

319.     Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

320.     Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

321.     Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments in exchange for patient referrals.

322.     Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants because, in many cases, the

Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the Provider Defendants.

323.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Dr. Ahmad**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

324.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

325.    Community Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

326.    Dr. Ahmad knowingly has conducted and/or participated, directly or indirectly, in the conduct of Community Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments for the Fraudulent Services that Community Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Community Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the

billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Community Medical's employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

327.    Community Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Dr. Ahmad operated Community Medical, inasmuch as Community Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Community Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Community Medical to the present day.

328.    Community Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Community Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

329.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $283,000.00 pursuant to the fraudulent bills submitted by the Defendants through Community Medical.

330.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Dr. Ahmad and John Doe Defendants "1" through "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

331.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

332.   Community Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

333.   Dr. Ahmad and John Doe Defendants "1" through "10" are employed by and/or associated with the Community Medical enterprise.

334.   Dr. Ahmad and John Doe Defendants "1" through "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Community Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments for the Fraudulent Services that Community Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Community Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Community Medical's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the

date of this Complaint are described in the chart annexed hereto as Exhibit "1."

335.     Community Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Community Medical was operated, inasmuch as Community Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Community Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Community Medical to the present day.

336.     Dr. Ahmad and John Doe Defendants "1" through "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

337.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $283,000.00 pursuant to the fraudulent bills submitted by Defendants through Community Medical.

338.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Dr. Ahmad and  Community Medical**
**(Common Law Fraud)**

339.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

.

340.     Dr. Ahmad and Community Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

341.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Community Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined fraudulent protocol designed solely to enrich the Defendants; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Community Medical, when in fact many of the billed-for services were provided by independent contractors.

342.     Dr. Ahmad and Community Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Community Medical that were not compensable under the No-Fault Laws.

343.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $283,000.00 pursuant to the fraudulent bills submitted

by the Defendants through Community Medical.

344.     Dr. Ahmad and Community Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

345.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Dr. Ahmad and Community Medical**
**(Unjust Enrichment)**

346.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

347.     As set forth above, Dr. Ahmad and Community Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

348.     When GEICO paid the bills and charges submitted by or on behalf of Community Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Ahmad and Community Medical's improper, unlawful, and/or unjust acts.

349.     Dr. Ahmad and Community Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

350.     Dr. Ahmad and Community Medical's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

351.     By reason of the above, Dr. Ahmad and Community Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $283,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1" through "10"**
**(Aiding and Abetting Fraud)**

352.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

353.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Community Medical and Dr. Ahmad.

354.     The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

355.     The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Community Medical or Dr. Ahmad to obtain payment from GEICO and other insurers for the Fraudulent Services.

356.     John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Community Medical for the medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

357.     The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $283,000.00 pursuant to the fraudulent bills submitted through Community Medical.

358.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

359.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Dr. Ahmad
### (Violation of RICO, 18 U.S.C. § 1962(c))

360.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

361.    Comfort Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

362.    Dr. Ahmad knowingly has conducted and/or participated, directly or indirectly, in the conduct of Comfort Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments for Fraudulent Services that Comfort Care was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Comfort Care obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than

by Comfort Care's employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

363.    Comfort Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Dr. Ahmad operated Comfort Care, inasmuch as Comfort Care never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Comfort Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Comfort Care to the present day.

364.    Comfort Care is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Comfort Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

365.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by the Defendants through Comfort Care.

366.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Dr. Ahmad and John Doe Defendants "1" through "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

368.    Comfort Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

369.    Dr. Ahmad and John Doe Defendants "1" through "10" are employed by and/or associated with the Comfort Care enterprise.

370.    Dr. Ahmad and John Doe Defendants "1" through "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Comfort Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for seeking payments for Fraudulent Services that Comfort Care was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Comfort Care obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Comfort Care's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart

annexed hereto as Exhibit "2."

371.    Comfort Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Comfort Care was operated, inasmuch as Comfort Care never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Comfort Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Comfort Care to the present day.

372.    Dr. Ahmad and John Doe Defendants "1" through "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

373.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by Defendants through Comfort Care.

374.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Against Dr. Ahmad and Comfort Care
### (Common Law Fraud)

375.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

376.     Dr. Ahmad and Comfort Care intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

377.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Comfort Care was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined fraudulent protocol designed solely to enrich the Defendants; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Comfort Care, when in fact many of the billed-for services were provided by independent contractors.

378.     Dr. Ahmad and Comfort Care intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Comfort Care that were not compensable under the No-Fault Laws.

379.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by the Defendants through Comfort Care.

380.     Dr. Ahmad and Comfort Care's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

381.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Dr. Ahmad and Comfort Care
### (Unjust Enrichment)

382.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

383.     As set forth above, Dr. Ahmad and Comfort Care have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

384.     When GEICO paid the bills and charges submitted by or on behalf of Comfort Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Ahmad and Comfort Care's improper, unlawful, and/or unjust acts.

385.     Dr. Ahmad and Comfort Care have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

386.     Dr. Ahmad and Comfort Care's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

387.    By reason of the above, Dr. Ahmad and Comfort Care have been unjustly enriched in an amount to be determined at trial, but in no event less than $700,000.00.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Against John Doe Defendants "1" through "10"**
**(Aiding and Abetting Fraud)**

388.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

389.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Comfort Care and Dr. Ahmad.

390.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

391.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Comfort Care or Dr. Ahmad to obtain payment from GEICO and other insurers for the Fraudulent Services

392.    John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Comfort Care for the medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

393.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $700,000.00 pursuant to the fraudulent bills submitted through Comfort Care.

394.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

395.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TWELFTH CAUSE OF ACTION**
**Against Dr. Ahmad and DLC Comprehensive**
**(Common Law Fraud)**

396.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

397.    Dr. Ahmad and DLC Comprehensive intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

398.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that DLC Comprehensive was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined fraudulent protocol designed solely to enrich the Defendants; (iii) in every claim, the representation that the billed-for services were

90

properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of DLC Comprehensive, when in fact many of the billed-for services were provided by independent contractors. The fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3."

399.    Dr. Ahmad and DLC Comprehensive intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DLC Comprehensive that were not compensable under the No-Fault Laws.

400.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted by the Defendants through DLC Comprehensive.

401.    Dr. Ahmad and DLC Comprehensive's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

402.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against Dr. Ahmad and DLC Comprehensive
### (Unjust Enrichment)

403.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

404.    As set forth above, Dr. Ahmad and DLC Comprehensive have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

405.    When GEICO paid the bills and charges submitted by or on behalf of DLC Comprehensive for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Ahmad and DLC Comprehensive's improper, unlawful, and/or unjust acts.

406.    Dr. Ahmad and DLC Comprehensive have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

407.    Dr. Ahmad and DLC Comprehensive's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

408.    By reason of the above, Dr. Ahmad and DLC Comprehensive have been unjustly enriched in an amount to be determined at trial, but in no event less than $13,000.00.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Against John Doe Defendants "1" through "10"
### (Aiding and Abetting Fraud)

409.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

410.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by DLC Comprehensive and Dr. Ahmad.

411.     The acts of John Doe Defendants "1" through "10"in furtherance of the fraudulent scheme included assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

412.     The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for DLC Comprehensive or Dr. Ahmad to obtain payment from GEICO and other insurers for the Fraudulent Services.

413.     John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to DLC Comprehensive for the medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

414.     The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $13,000.00 pursuant to the fraudulent bills submitted through DLC Comprehensive.

415.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

416.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Against Dr. Ahmad and the Ahmad Riaz Practice
### (Common Law Fraud)

417.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

418.    Dr. Ahmad and the Ahmad Riaz Practice intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills through the Ahmad Riaz Practice seeking payment for the Fraudulent Services.

419.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Ahmad Riaz Practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not eligible to receive No-Fault Benefits because it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined fraudulent protocol designed solely to enrich the Defendants; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of the Ahmad Riaz Practice, when in fact many of the billed-for services were provided by independent contractors.  The fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

420.    Dr. Ahmad and the Ahmad Riaz Practice intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Ahmad Riaz Practice that were not compensable under the No-Fault Laws.

421.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $770,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Ahmad Riaz Practice.

422.    Dr. Ahmad and the Ahmad Riaz Practice's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

423.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Against Dr. Ahmad and the Ahmad Riaz Practice
### (Unjust Enrichment)

424.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

425.    As set forth above, Dr. Ahmad and the Ahmad Riaz Practice have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

426.    When GEICO paid the bills and charges submitted by or on behalf of the Ahmad Riaz Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Ahmad and the Ahmad Riaz Practice's improper, unlawful, and/or unjust acts.

427.    Dr. Ahmad and the Ahmad Riaz Practice have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding the improper, unlawful, and unjust billing scheme.

428.    Dr. Ahmad and the Ahmad Riaz Practice's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

429.    By reason of the above, Dr. Ahmad and the Ahmad Riaz Practice have been unjustly enriched in an amount to be determined at trial, but in no event less than $770,000.00.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Against John Doe Defendants "1" through "10"**
**(Aiding and Abetting Fraud)**

430.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

431.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Ahmad and the Ahmad Riaz Practice.

432.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

433.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dr. Ahmad and the Ahmad Riaz Practice to

obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

434.    John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Dr. Ahmad and the Ahmad Riaz Practice for the medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

435.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $770,000.00 pursuant to the fraudulent bills submitted through the Ahmad Riaz Practice.

436.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

437.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### Against Dr. Ahmad and the Riaz Ahmad Practice
### (Common Law Fraud)

438.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

439.    Dr. Ahmad and the Riaz Ahmad Practice intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills through the Riaz Ahmad Practice seeking payment for the Fraudulent Services.

440.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Riaz Ahmad Practice was eligible

to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not eligible to receive No-Fault Benefits because it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a predetermined fraudulent protocol designed solely to enrich the Defendants; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of the Riaz Ahmad Practice, when in fact many of the billed-for services were provided by independent contractors. The fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

441. Dr. Ahmad and the Riaz Ahmad Practice intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Riaz Ahmad Practice that were not compensable under the No-Fault Laws.

442. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $550,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Riaz Ahmad Practice.

443. Dr. Ahmad and the Riaz Ahmad Practice's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

444.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
**Against Dr. Ahmad and the Riaz Ahmad Practice**
**(Unjust Enrichment)**

445.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

446.     As set forth above, Dr. Ahmad and the Riaz Ahmad Practice have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

447.     When GEICO paid the bills and charges submitted by or on behalf of the Riaz Ahmad Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Ahmad's and the Riaz Ahmad Practice's improper, unlawful, and/or unjust acts.

448.     Dr. Ahmad and the Riaz Ahmad Practice have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding the improper, unlawful, and unjust billing scheme.

449.     Dr. Ahmad and the Riaz Ahmad Practice's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

450.     By reason of the above, Dr. Ahmad and the Riaz Ahmad Practice have been unjustly enriched in an amount to be determined at trial, but in no event less than $550,000.00.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against John Doe Defendants "1" through "10"
### (Aiding and Abetting Fraud)

451.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

452.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Ahmad and the Riaz Ahmad Practice.

453.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and implementing the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

454.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dr. Ahmad and the Riaz Ahmad Practice to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

455.    John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Dr. Ahmad for the medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services billed through the Riaz Ahmad Practice because they sought to continue profiting through the fraudulent scheme.

456.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $550,000.00 pursuant to the fraudulent bills submitted through the Riaz Ahmad Practice.

457.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

458.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-FIRST CAUSE OF ACTION**
**Against Dr. Ahmad**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

459.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

460.   Community Medical, Comfort Care, DLC Comprehensive, the Ahmad Riaz Practice, and the Riaz Ahmad Practice constitute an association-in-fact "enterprise" (the "Ahmad Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.   The members of the Ahmad Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amendable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.   Specifically, Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice ostensibly are independent entities and sole proprietorships – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.   The Ahmad Fraud Enterprise has been operated under five separate names and tax identification numbers in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from

any one business.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Ahmad Fraud Enterprise acting singly or without aid of each other.

461.    The Ahmad Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professional and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

462.    Dr. Ahmad has been employed by and/or associated with the Ahmad Fraud Enterprise.

463.    Dr. Ahmad knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Ahmad Fraud Enterprise's affairs through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments for Fraudulent Services that Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice were not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a predetermined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing

codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice obtained their patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, or the Ahmad Riaz Practice's employees.   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" – "5".

464.   The Ahmad Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Dr. Ahmad operated the Ahmad Fraud Enterprise, inasmuch as Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Ahmad Fraud Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice to the present day.

465.   The Ahmad Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by the Ahmad Fraud Enterprise in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

466.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,300,000.00 pursuant to the fraudulent bills submitted by the Defendants through Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice.

467.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
**Against Dr. Ahmad and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

468.    GEICO incorporates, as through fully set forth herein, each and every allegation in the paragraphs set forth above.

469.    Dr. Ahmad and John Doe Defendants "1"-"10" are employed by and/or associated with the Ahmad Fraud Enterprise.

470.    Dr. Ahmad and John Doe Defendants "1" through "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Ahmad Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments for Fraudulent Services that Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice were not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary;

(ii) the billed-for-services were performed and billed pursuant to a predetermined fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice obtained their patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for-services were provided – to the extent they were provided at all – by independent contractors, rather than by Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1"-"5".

471.    Dr. Ahmad and John Doe Defendants "1" through "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

472.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,300,000.00 pursuant to the fraudulent bills submitted by Defendants through Community Medical, Comfort Care, DLC Comprehensive, the Riaz Ahmad Practice, and the Ahmad Riaz Practice.

473.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## **JURY DEMAND**

474.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

       **WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

       A.     On the First Cause of Action against Dr. Ahmad and the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Dr. Ahmad and the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants;

       B.     On the Second Cause of Action against Dr. Ahmad, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $283,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       C.     On the Third Cause of Action against Dr. Ahmad and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $283,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       D.     On the Fourth Cause of Action against Dr. Ahmad and Community Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $283,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

       E.     On the Fifth Cause of Action against Dr. Ahmad and Community Medical, more than $283,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

       F.     On the Sixth Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$283,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Dr. Ahmad, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Dr. Ahmad and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Dr. Ahmad and Comfort Care, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $700,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Dr. Ahmad and Comfort Care, more than $700,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $700,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Dr. Ahmad and DLC Comprehensive, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$13,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Dr. Ahmad and DLC Comprehensive, more than $13,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $13,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Dr. Ahmad and the Ahmad Riaz Practice, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $770,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Dr. Ahmad and the Ahmad Riaz Practice, more than $770,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $770,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Dr. Ahmad and the Riaz Ahmad Practice, compensatory damages in favor of GEICO in an amount to be determined at trial but in

excess of $550,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Dr. Ahmad and the Riaz Ahmad Practice, more than $550,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $550,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Dr. Ahmad, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Dr. Ahmad and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: November 3, 2022

RIVKIN RADLER LLP


By: _/s/ Michael Sirignano_
Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Sean Gorton, Esq.
926 RXR Plaza

Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government
Employees Insurance Company, GEICO
Indemnity Company, GEICO General
Insurance Company and GEICO Casualty
Company*